Good morning and welcome to the last day of our sitting in Atlanta this week. We're happy to see all of your faces here in court in person today. Just a few announcements before we begin. I think that many of you are familiar with the court's lighting system, but in the event you're not, you'll see a red, green, and a yellow light on our timer. And those are kind of like traffic lights. When the yellow light comes on, you have two minutes remaining in your argument. And when the red light comes on, we ask that you conclude your sentence, conclude your remarks as quickly as possible, unless you are answering a question from the court. And if we keep you over your time, then that will not cut into your rebuttal time if you're the appellant. But you may answer if you're answering the court's question. And we have studied your cases thoroughly, so we encourage you to go right to the heart of your most important issues and arguments. With that, we'll call the first case, which is number 21-10732, United States v. Estrada. Mr. Madden for the appellant. Arthur Madden for Victor Estrada. What makes Victor Estrada so special? I mean, so special that he deserves a 360-month upward variance sentence. He was driving a rusting 2013 Freightliner cab on Interstate 65 in Sarah Land, Alabama, back in January of 2019. Stopped for a equipment violation. Discovered 23 kilograms of cocaine in a banker's box behind the seat of the cab. His passenger, girlfriend, the co-defendant, Linda Lancon, had $1,517 in her purse. He pled guilty to conspiracy to possess with intent to distribute cocaine. The guideline level was 32 due to the quantity, 15 to 50 kilograms of cocaine. Three-point reduction for acceptance of responsibility. Criminal history category 5. And a guideline sentencing range from 140 to 175 months. The government twice didn't dispute the guideline calculations. In the first sentencing, the government recommended a high-end guideline sentence of 175 months. The court imposed a 30-year sentence. That sentence was vacated by this court as plain error because it was based on testimony from Linda Lancon's trial. She went to trial. He pled guilty. At the second sentence, the one on remand, the government recommended an appropriate sentence. What are the individualized, particularized facts that the court found that would justify a sentence? Well, on the facts of this case, keeping in mind that a major variance requires a more significant justification than a minor one. And it must be sufficiently compelling to support the degree of the variance. And how is the evidence that was presented at the second hearing, the government put on two witnesses, the Department of Homeland Security agent and the GBI agent, how was the evidence presented the second time around? How does it not meet that standard? Well, first, the Homeland Security agent, Agent Harrington, testified that in the six weeks prior to the stop in January of 2019, the freight liner made a total of eight trips. The last one was the arrest, seven trips from the Laredo area of Texas to various locations in the south and southeast. He testified that he didn't know if there was any cargo, who was driving, whether Estrada was in the truck. And what he said was, I have nothing that says Mr. Estrada moved cocaine any time except this trip. I can't say that. The government didn't attempt to prove his relevant conduct, these other trips. They didn't do any investigation. They didn't say where those trips originated, the particular destination. There was no evidence about what occurred. Right, but according to the DHS agent, Estrada told investigators that he had previously met his drug delivery contact in Atlanta, even though he later contradicted that meeting. So the DHS agent also testified to that as well. He did testify to that. But there was nothing, there were no specific facts as to quantity, which is the primary driver of drug sentencing, what drug, what the conversation was, what the activities were, how long they lasted. And then if you go to what the court's reasoning was, and we're going to talk about that, the sentence was based on Estrada's claimed by the government, or by the court, the government didn't claim it, membership in the Mexican Mafia. But the district court judge also said, I credit all of the testimony I've heard today. The district court certainly mentioned the Mexican Mafia, but with that statement, why aren't we taking that at face value? The district court, after hearing all the government's evidence at the resentencing hearing, said I credit all of the testimony I've heard today. Well, yeah, what the court said is, they put together, the court put together the two parts. One is that they were prior trips, and the other is Mexican Mafia affiliation. I agree with the testimony that Agent Harrington, that all of the evidence is consistent with someone who is a longstanding member. Of course, the trips were only six weeks. Longstanding memory of a drug trafficking group. And the testimony of Agent Coleman shows that Mr. Estrada is involved in organized crime. These findings are not supported in the record, that there is a longstanding member of a drug trafficking group is involved in organized crime. And the organized crime, the only one that was discussed, was the testimony from the Georgia investigator that said these tattoos that Estrada had were similar or consistent with those of Mexican Mafia. Although the testimony was that the tattoos had been on there since 2004, and even that the Georgia investigator said, I asked him, does that indicate present gang affiliation? And he said, it depends. We don't use tattoos solely to identify an individual as associated with a particular gang or not. So there are weak inferences and speculation on both parts. But you can bind them, and then the judge comes to the firm conclusion, I agree that longstanding member of a drug trafficking group involved in organized crime. And then he said, I would be doing a disservice to my job if I didn't sentence in this huge variance, which is to assess Mr. Estrada's criminal activities were both those he was caught red-handed doing and those other acts that he engaged in and engaged in successfully. Other acts unproven. There's nothing in the record that what those acts were. So my sentence takes all of that into account. What if we put aside, for the purposes of discussion, the Mexican Mafia evidence, put that to one side? How is there not still more than enough evidence in this record to give rise to a reasonable inference that Estrada was a habitual drug trafficking offender? Well, I mean, first, the Harrington evidence only goes to the six weeks from November 30th of 2018 to the stop on January 19th, 2019. There's six weeks. That's the period we're talking about. He does have a prior drug conviction from 2013, or no, 2003, I think the conduct was in 2002, involving three grams of cocaine and two grams of heroin. That's it. That's it. To say you're a longstanding member of a drug trafficking organization, it's not in the record. Well, you've got Estrada telling investigators that he had previously met his drug delivery contact in Atlanta. Also, Harrington testified that this probably wasn't Estrada's first time transporting drugs because the drug supplier trusted him enough to allow him to carry the cocaine in the cab. The drug dealers let him pick up currency, which suggests that Estrada is in a position of trust. And then $1,500 is found in Lancon's purse. The facts of this case are completely unremarkable. There's no hidden compartments. The fact that it's stuck in a banker's box behind the seat goes the other way. That doesn't show sophistication or planning or organization. Doesn't it show trust? Not if someone puts a GPS monitor on the truck. It doesn't show trust at all. And $1,500, it wasn't even important enough for the agents to seize. They didn't even take it. So those are things that unexplained wealth, all kinds of money, sophistication, but the government didn't even try to prove. And they should have been highly motivated to prove relevant conduct, to jack up the offense level. This is their case. This all occurred within six months. Did Mr. Estrada own this truck? Pardon me? Did he own the truck? He said he had bought it two years before. Right. I'm just going to the length of time here. And as I understand it, he also said he worked for two years for the trucking company from 2014 to 2016 as a long-haul driver. He was a driver, yes. No, but he was a driver of this truck for two years that he owned working for the trucking company in Laredo. No, I believe the two years was the two years that he bought the truck two years before, which would have been in 16. Well, the PSI says he was a long-haul driver for the trucking company from 14 to 16. That was a different— But that's a different truck. That's a different employment and a different truck, yes. This one, he bought the truck two years before the stop. And Linda Lancon was— This stop was when again? January 15th of 19. 19. Yes. Okay. So he had the truck at that time from 17 to 19 that he owned and made— Yes. —and was a long-haul driver 17 to 19. I know we have the six weeks you're talking about, but the fact remains he was a long-haul truck driver for two years from Laredo to up here, around here, Alabama for 17, 18, 19. I know about the six weeks. That's cure. We got that. We'll separate that. But he owned the truck that he did his trips the six weeks in for two years prior to that. Yes. And he worked as a long-haul truck driver during that period, too. That's correct. And then prior to that, he had two years as a long-haul truck driver for another company. Yes, I think he's worked as a truck driver, yes, as his career. But as far as him driving on those—in those trips in the six weeks, there's no evidence of that, and that's what Harrington says— No, but it's his truck that's driving. It's his truck that— That he owns. His truck was being driven. I don't know whether he drove or not, but there's some evidence that he made the trips, and it's his truck that's making the trips. It's—yes, and then— Is there any evidence he let other people use the truck? No, I don't think he said that. But although Linda Lincoln was the one who got the GPS and put it on there, she said that she was—she dealt exclusively with the monitoring company. And the agent Harrington, who I presume is highly motivated to investigate, says, I have nothing that says Mr. Estrada moved cocaine any time except this trip. Let me just make sure I understand your argument. As I read your brief, your substantive and procedural unreasonableness arguments are both based on this argument you're making now, is that right? About whether he's been in the drug trafficking business for a long time and he's a member of, quote, organized crime. Well, he's a member of the Mexican mafia. That's not substantiated. Right, but I understand your argument about the insufficiency of the evidence, but I'm asking you, is that the basis for your unreasonableness arguments? On the procedural unreasonableness. The substantive unreasonableness is the court's explanation of how it arrived at the sentence and it's his explanation that he'd be doing a disservice to his job because if he didn't punish Estrada for his—as a longstanding member of a drug trafficking group for that that he's caught red-handed doing and those other criminal acts he engaged in and engaged in successfully. So he's not—uncharged conduct, unconvicted, undefined conduct, longstanding, it's too far a reach. And I'll come back on my rebuttal, I guess. I'd have another point on that. I understand your argument. Thank you. We'll give you your full five minutes for rebuttal. Thank you. Mr. Gray. Thank you, Your Honor. Scott Gray on behalf of the United States of America and may it please the court. In this appeal, the court must decide whether Victor Estrada's 360-month sentence is reasonable. The district court's upward variance from a guidelines range of 140 to 175 months is both reasonable and in good company with the upward variances that this court has affirmed in Overstreet, in Shaw, and in Early. At the resentencing hearing, the district court corrected the plain procedural error that this court previously had identified and remedied that issue by hearing live testimony from three witnesses and considering additional evidence in the record. It then based the sentence primarily on two factors, Estrada's conduct and his criminal history. This court should affirm that variance. Reasonableness at sentencing ultimately has two components. It has a procedural component and a substantive one. I read Estrada's brief to focus both his procedural and substantive arguments on a factual finding or an asserted factual finding concerning membership in the Mexican mafia, asserting both that there was a finding on that score, it was clearly erroneous, and that that then drove the sentence. Each step in that analysis misses the mark of the district court's concern. The district court's primary concern was that Estrada engaged in other trafficking conduct, and there was abundant circumstantial evidence in this record to support a reasonable inference that Estrada had trafficked in narcotics on other occasions and he had not been caught. The district court's analysis was also both backward-looking and forward-looking, looking, for example, at the circumstantial evidence, the GPS data, Estrada's asserted ownership of the truck for a period of two years, his relationship with his co-conspirator Linda Lancon for one year, the quantity of the narcotics involved here, 32 kilograms of cocaine, with a street value I believe that Agent Harrington testified was just south of $1 million on a per-kilogram basis. The court considered all of that evidence and concluded that this was not Estrada's first rodeo. This was not his first trip from Laredo to another destination, frequently Atlanta, carrying a significant quantity of a controlled substance. The court also reasonably inferred, like this court did in Shaw, that there was a substantial risk of future criminal conduct. As the court explained, individuals who are engaged in drug trafficking typically will engage in this conduct again and again and again until they are caught. And here an observant officer in Sarah Land, Alabama, saw Estrada's truck and noticed some of the factors that Estrada mentioned, namely that certain things about that truck didn't add up and that investigation led to the discovery of the cocaine in this instance. However, the reasonable inference from this record, if the officer had not found him in Sarah Land, Alabama, is that he would have traveled to Atlanta, he would have deposited the 32 kilograms of cocaine, and he would have loaded up with money, taken it back to Laredo, Texas, and then he would have turned around, maybe hours, maybe a day later in Laredo, Texas, and done the same thing again. And the district court ultimately determined, in this case, that it was reasonable to put that conduct to an end, to ensure that this would be the last new paragraph in Estrada's criminal history. Your Honor, sorry. No, actually I did have a question, but I was waiting for you to finish your sentence. And what I wanted to ask you, so Mr. Madden specifically points to the district court's statement that he was a longstanding member of a drug trafficking organization. But here we've got six weeks of GPS data. What evidence was there that this scheme went beyond six weeks? So, Your Honor, I don't know that there's evidence that this precise scheme went beyond specific weeks, at least direct evidence. So there is circumstantial evidence that they could have been involved in other activity. For example, there was claimed ownership of the truck for two years. There was a one-year relationship with co-conspirator Len Cohn. But Estrada makes much of the fact in his brief that he'd had these tattoos for years. I think he says that there's evidence in a pre-sentence report that he had them in 2004. And Estrada then asserts that that poses some sort of a problem. That actually reinforces the amount of time that he quite possibly was a member in this group. Because one of the things Agent Coleman testified about, and this is on page 60 of the re-sentencing hearing transcript, is that individuals who are in prison, if they have these tattoos, they face potentially dire consequences if they have these tattoos and are not a member of the organization that those tattoos tend to signify. So put another way, there are no Mexican mafia aficionados in prison. And the pre-sentence report indicates that Estrada was in and out of prison after he indicates that he had those tattoos. Right, but Agent Coleman admitted that you can't rely solely on the tattoos to show that someone's a member of this organization. Is that right? That's correct, Your Honor. And here there was other evidence of that fact, including the significant quantity of the cocaine involved, which demonstrates a regular source of supply. But, Your Honor, there's also— Excuse me, was there any other testimony about his membership in this organization, this gang, other than the tattoos? So, yes, Your Honor, but it is circumstantial. And I think the key point is that circumstantial evidence counts too. So I would point, Agent Coleman testified that there are essentially three parts of the triangle to the Mexican mafia, and I believe that's on page 57 of the re-sentencing hearing transcript. And what he says essentially is that the Mexican mafia provides so-called protection in the prison system, and then the cartels supply narcotics to a third group, the Sereños, who then transport that across the United States. And the United States submits that Estrada's conduct fits neatly within that three-tiered system. So, for example, Agent Harrington testified that Laredo is a major site for narcotics to be smuggled across the border, which supports an inference that that easily could be coming from cartels across the border into Laredo. Moreover, Estrada has been in and out of prison for most of his adult life. Therefore, he certainly has had the opportunity to be exposed and to consider the needs to avail himself of the, quote-unquote, protection that the Mexican mafia supposedly provides. And then there are the routine trips from the border in Laredo to Atlanta, and I think there's one or two to another destination that events regular drug trafficking. And then, of course, the inference that this conduct would have continued based on his source of supply until ultimately he was caught and apprehended. At least part of your argument seems circular to me, though, that if he's in the Mexican mafia, he would have received protection in prison, but that doesn't show that he's in it in the first place, right? Your Honor, the argument is that all of these inferences are considered together so that any one of these standing alone might be insufficient, but that the court has to consider the totality of the circumstances, and it has to consider all of the factors here. The quantity of the narcotics, which events a significant level of trust. The fact, as Agent Harrington testified, that he was going to take the cash back to or the currency, the payment for the drugs. And what was the basis for that inference? That he was going to take the cash back. I believe there's testimony from Agent Harrington both that Estrada said this during the initial stop in the investigation, and then he talked about and he laid out the inferences that he drew from that as an experienced drug officer, the things that led him to believe that this was not Estrada's first trip. But, Your Honor, I also want to make sure I emphasize the alternative point, which is that even if the court disagrees about the Mexican Mafia finding, that is not dispositive of the sentence, either as a procedural matter or as a substantive one. When the Supreme Court in Gaul and this court in cases like Shaw have spoken of procedural reasonableness in the aspect of fact-finding, it has spoken of a sentence that is based on a clearly erroneous fact. And here, the sentence is not based on Estrada's membership in the Mexican Mafia. The sentence is based on the fact that Estrada engaged in other drug trafficking trips and that he evinced a serious criminal history in and out of prison for most of his adult life, that he had multiple offenses for which he received no criminal history points under the guidelines calculations, and that his conduct over time demonstrated an escalation in his conduct. He began, for example, in the federal system with alien smuggling. He had three alien smuggling convictions, and then in this instance, he had escalated to drug trafficking, and not merely drug trafficking, but the trafficking of a significant quantity of cocaine. Therefore, the sentence is not ultimately based on the finding that he's a member of the Mexican Mafia. The Mexican Mafia inference was a component of a finding based on his conduct. I think the court's discussion in Overstreet is actually a helpful example in that regard. The Overstreet court confronted a district court's finding that the defendant had committed a murder, and in that instance, the court set out, I believe it was seven different pieces of circumstantial evidence that supported that conclusion. And if one of those items went away and the court were left with six, that wouldn't necessarily make the ultimate finding clearly erroneous. And here, if the Mexican Mafia finding went away, which, again, it shouldn't, but even if it did, the finding that Estrada was a serious drug trafficker, that he trafficked before, and inferring that he could easily traffic again, given his source of supply, that was reasonable on this record and certainly supported an upward variance sufficient to deter him from any further criminal conduct. There were some photographs found in the truck, and one of them is referred to as a picture of a box of money. Is that money separate from her money in the purse? Your Honor, that's my understanding, or at least there's no direct connection. I think Your Honor's referring to a photo that was on Linda Lynn. Oh, that's right. It's on her phone. Yes, Your Honor. Okay, so it's not in the truck. Okay. So, Your Honor, there's a lot of photographic evidence in the record, and that was offered—sorry, I didn't want to cut you off if you had a question. No, well, what does the photograph show on her phone? I believe there's a photograph on her phone at the very end of 2018, very beginning of 2019, that shows a purse that appears similar to the purse that officers found in the truck with Lincoln and a box of money. But what does a box of money mean? The box of money was presented as simply more circumstantial evidence that Lincoln and Estrada had made other trips, and there were other photographs as well that were showing, basically, communications between the Linda Lynn cone cell phone and this flip phone that officers also found that was connected to Estrada. But if recollection serves, the box of money— So we don't know if the box of money was a lot of money, a little money, or what it was? My understanding is that we don't know the amount of money they traveled with. All we know is it says box of money. Okay. We know that there's a box, and I believe it appears to—there are, I think, a picture or two that there's an unclear amount of currency in those photos. And that's in the record in this case? That's one of the exhibits, yes, Your Honor, to the resentencing hearing. There's a series of photographs. But I was under the impression somehow they were laying around in the truck, but what they were on were her cell phone. That's—yes, Your Honor, that's my understanding. And how recently dated were these photographs on the cell phone? Were they contemporaneous or way in the past? The photographs, from my recollection, were in roughly the same time period as the GPS data. It's the six trips. Okay. Yes, Your Honor. And I want to say that the photo Your Honor is referring to was, I want to say, December 30th or December 31st. 18 before the 19 arrests. Yes, Your Honor, in January of 2019. And that the—and then there were other photos. I think a lot of them were of different trucks. Explain one other thing. She apparently asked to put the GPS on. Is she a government informant when she's doing all this, or what is she? So, Your Honor, and I'm not sure that that's in the record, so I want to— I don't want to go outside the record. Okay, but I—she places a GPS tracking device in the truck as part of the— That's all we know. That's the only thing that I can—there is other testimony about that in her trial, but I don't want to— You can't—no, we don't want to go there. Yeah, I'd rather not stray into that. Right. So she was tried, too? She proceeded to trial, yes, Your Honor. Okay, okay. And she was— Oh, no, he pled guilty, right, so she was tried. All right, we don't want to get into that. Yes, Your Honor. And I would pivot with the brief time I have remaining, unless the court has any further procedural questions about the fact-finding, to emphasize that the— I don't know whether it's permissible—can we know if she was convicted? Is that in this record, whether she was convicted or not convicted? So, yes, Your Honor, and I believe Estrada cites in his brief to the court's unpublished decision in Lincoln's trial, which includes a brief survey of the facts and addresses both— Okay. And it indicates that there was an upward variance in her case as well, which was affirmed. But, yes, Your Honor— And what was her sentence? Her total sentence was 300 months, as I recall. Okay. And I see that my time has expired. Okay. Unless there are further questions from the court, I respectfully would ask that Estrada's sentence be affirmed. Thank you. Mr. Madden? The government's argument here really contrasts with its passivity that it displayed in the district court. They didn't try to do any of this when it mattered, when—to argue that it shouldn't be level 32 because of the cocaine. It should be 34 or 36 or 38. They would have had to have proven that by a preponderance of the evidence. They didn't try to say, well, Estrada was an organizer, a manager, a supervisor. They would have had to have proven that by a preponderance of the evidence. They didn't object that he accepted responsibility. He pled guilty. There was a 10-year minimum mandatory. The low end of the guideline was something like 11. The high end was 14. They didn't object to that. So, now to come in and say we've got all this circumstantial evidence. You can draw these inferences. Getting back to the question of the procedural or substantive unreasonableness of the sentence, this court has said that a major variance requires a compelling justification. So, there's sort of a separate sliding burden of proof that Judge Carnes fashioned that the more of a deviation, the more of a variance, the higher the requirement for the justification. And you don't have that here. It's what the judge said when he talked to the agent. And this, I think, is important. He talked to Agent Coleman. He's the tattoo expert who never met Estrada and looked at three pictures of his body. So, Agent Coleman, if you saw somebody marked like this, would it surprise you that they were found in possession of more than 30 kilograms of cocaine? Oh, no. It wouldn't surprise me, Your Honor. And then he goes on. So, now, what would membership in the – why would one be a member of the Mexican Mafia? What is the benefit of membership? And the witness says, well, it's protection while you're in prison, and then you have to do what they want out. And then he says, and what kind of activities are members of the Mexican Mafia engaged in? It's drug trafficking, extortion, homicide, fraud, pretty much the gamut of all the acts that were listed as racketeering. The court, so it's organized crime? Yes, sir. This sentence was based on the court's finding that Estrada was a member of the Mexican Mafia and a member of a longstanding drug trafficking group. They're trying to run from that conclusion. That's what the district judge told us. That's what he did. And to say, well, there are inferences, and you can suggest that people that do traffic drugs today are going to traffic drugs tomorrow, that's no different than anybody that appears in our courts. This is a run-of-the-mill drug case that's been pumped up after the fact into something that it's not. And there is no justification for that major variance. You know, the court in Judge Wilson, in his dissent in the United States versus Rosales-Bruno, he suggested that this court, the appeals court, our appeals court, treats upward variances differently than downward variances, that downward variances are strictly scrutinized. We look at them very carefully. But upward variances, eh, take a look at it, glance, yeah, it looks okay. It's within the discretion. And he said that this signaled the district courts how to treat it. The majority in that case, Judge Carnes, he's talking about E-rate, he assured us that that's not the case, that we're even-handed in the review. We apply it across the board. A major variance requires a major justification, whether it's up or down. That's all, that's all I want. While you're on that subject, my impression is, and you can correct me, that the downward variances we've reversed have been in child abuse cases, sexual cases where they just slap them on the wrist, and mainly financial crimes. We've done lots of them where the district court gives probation and we say, wait, wait, wait, no, no, no, all this kind of stuff, pay this big restitution, you don't serve any time. We just had one we just released recently. Those have really been the downward variances. I don't know of a downward variance in a kind of a drug trafficking case. Forget about how long this trafficking has been. This is a drug conspiracy to drug traffic, right? It is. Okay. Do you have any one case where there's a downward variance in a drug trafficking case that we've reversed? Or they're all? Well, no. I'm curious because you're making this point, we treat double standard, and I'm just trying to address it because I think that's kind of a serious claim. It is. And so, but all those downward variances, at least my impression is, are slaps on the wrist, probation, one year or something, where there's serious, they're like white collar cases and where it's just not fair compared to like this case. Yep. Do you have a single downward variance? I know it's not fair maybe if you don't write it, but you made the point, where it's a drug trafficking downward variance that we have reversed. And I don't because, see, I think that what happens. That's okay. I just wanted to look at that case. You've answered my question. I appreciate it. But if I could just, the methodology is the same. Oh, I agree with that. The analytical framework should be the same. I think it should be equally strict whether it's up or down. And you've got 105% here, and you're saying it needs close scrutiny. I don't think anybody's equivocating about that. I think it's a matter of whether there's enough here to support a significant variance. I think that's. You've answered my question. I'm sorry. You've run over. Oh, I'm sorry. No, no, it's my fault. You've over two minutes. But you answered my question, so that's okay. Good. And I think with that, I'll close and just say I only want, and Estrada only wants the same scrutiny of this upward variance sentence that lower variance, downward variance sentences get. And the record does not support this dramatic. It's a life sentence for a man his age. Thank you. Mr. Madden, I know that you were appointed by the court, and you have done an excellent job in representing your client, and we thank you very much for that. Thank you.